**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WAG! GROUP CO., *et al.*,[1] | Case No. 25-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ALEC DAVIDIAN IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Alec Davidian, hereby declare under penalty of perjury:

1.     I am the chief financial officer ("CFO") of Wag! Group Co. ("Wag!") and Wag Labs, Inc. ("Wag Labs") and the treasurer ("Treasurer") of certain of the other above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company").[2] In my roles, I am responsible for leading the Company's finance organization, including accounting, reporting, financial planning and analysis, and treasury functions.

2.     I have over fifteen (15) years of experience in accounting and finance. I earned my Bachelor of Arts degree in accounting and finance from Newcastle University, and I am a Certified Public Accountant, formerly a certified member of the Association of Chartered Certified Accountants, and formerly a member of the American Institute of Certified Public Accountants. I joined the Company in November 2018 as a Corporate Controller, where my primary responsibility was building a new accounting team from the ground-up. In December 2019, I was promoted to Vice President of Finance & Accounting, and, in January 2021, I was promoted to

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Wag! Group Co. (0180), Wag Labs, Inc. (4381), Wag Wellness, LLC (N/A), Pawsome, LLC (2404), Compare Pet Insurance Services, Inc. (4657), We Compare, Inc. (5054), and Furmacy, Inc. (9977). The Debtors' headquarters is located at 2261 Market Street, Suite 86056, San Francisco, California 94114.

[2]    I do not hold a role at Debtor Wag Wellness, LLC.

CFO.  Before joining the Company, between 2012–2018, I worked at Ernst & Young LLP as a Senior Manager, where I advised high growth companies with accounting matters, Securities and Exchange filings, process improvements, and business scaling.  I have worked with numerous early-stage startups and Fortune 500 Companies during my career.

3.      In my capacity as CFO and Treasurer, I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

4.      Concurrently with the filing of this declaration (this "Declaration"), on the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, these "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.      The Debtors also concurrently filed the *Joint Prepackaged Plan of Reorganization of Wag! Group Co. and Certain of Its Affiliates* (as it may be amended, supplemented, restated, or modified from time to time, the "Prepackaged Plan"),[3] as well as a disclosure statement for the Prepackaged Plan (as it may be amended, supplemented, restated, or modified from time to time, the "Disclosure Statement").  As further discussed below, the Prepackaged Plan provides for the comprehensive restructuring of the Debtors' secured debt obligations (the "Restructuring") to be implemented through an efficient and expeditious chapter 11 proceeding.  These Chapter 11 Cases are being commenced following the solicitation of the Prepackaged Plan, which the Debtors seek to have confirmed by the Court on or about August 29, 2025, subject to the Court's availability. As described below, all holders who voted on the Prepackaged Plan have voted unanimously to

---

[3]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Prepackaged Plan.

accept the Prepackaged Plan, and, with the exception of one contingent, disputed, and unliquidated non-go forward claim, the Prepackaged Plan provides for all third party non-voting classes, including general unsecured creditors, to be paid in full or otherwise rendered unimpaired.

6.      To operate effectively and minimize certain of the potential adverse effects of the commencement of these Chapter 11 Cases, the Debtors have requested certain relief in "first day" motions and an application filed with the Court (collectively, the "First Day Pleadings").  As described below, through the First Day Pleadings, the Debtors seek, among other things, to (i) establish certain administrative procedures to promote a seamless transition into and through these Chapter 11 Cases, (ii) ensure the continuation of their business operations and cash management system without interruption, (iii) obtain debtor-in-possession financing and use cash collateral in the operation of their businesses, (iv) preserve valuable relationships with trade vendors and other creditors whose claims are not expected to be impaired by these Chapter 11 Cases, and (v) schedule a combined hearing for the Court to consider the adequacy of the Disclosure Statement, approval of the Debtors' prepetition solicitation procedures, and confirmation of the Prepackaged Plan.  As further discussed below, I am familiar with the contents of each of the First Day Pleadings, and I believe that the Debtors would suffer immediate and irreparable harm in the event that the relief sought in the First Day Pleadings is not granted.

7.      I submit this Declaration to provide an overview of the Debtors, their businesses, and these Chapter 11 Cases, as well as to support the Debtors' chapter 11 petitions and the First Day Pleadings.  Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial

3

condition.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I would testify competently to the facts set forth herein.

8.      Parts I through III of this Declaration provide an overview of the Debtors' businesses, organizational structure, and capital structure.  Part IV describes the circumstances leading to the commencement of these Chapter 11 Cases.  Part V provides an overview of the prepetition solicitation of the Prepackaged Plan, and Part VI summarizes the First Day Pleadings and the bases for the relief sought therein.

## I.     The Debtors' Business Operations

### A.     The Wag! Platform and the Debtors' Key Services

9.      Wag Labs was founded in 2014 with the goal of simplifying the logistics of pet care.  Consistent with that goal, in 2015, Wag Labs developed, and continues to develop and support, a proprietary marketplace technology platform available as a website and mobile app (the "Wag! Platform") that is designed to address pet owners' basic service, product, and wellness needs.  The Wag! Platform has evolved over time, starting out as the first on-demand dog walking service, launched in Los Angeles, California and expanding into approximately 5,300 cities nationwide.  Through various acquisitions, the Debtors have grown into a one-stop shop for pet care through the Debtors' expansions into the pet food and treat, pet wellness, and pet apparel markets and expanded to other online platforms, including, but not limited to, Petted.com, WeCompare.com, DogFoodAdvisor.com, CatFoodAdvisor.com, and Maxbone.com.

10.     As of the Petition Date, the Wag! Platform and the Debtors' other online platforms enable over 1 million pet owners (the "Pet Parents") to connect with over 500,000 independent pet

caregivers nationwide (the "Pet Caregivers"), pet experts, and service and product partners with respect to a multitude of pet care services.  An overview of the Debtors' offerings is provided below.

      i.    *Pet Care Services and Wag! Premium*

11.     Through the Wag! Platform, Pet Parents can connect directly with Pet Caregivers to schedule appointments for desired personalized services, including pre-scheduled and on demand dog walking, drop-in visits at the Pet Parent's home, pet boarding at a Pet Caregiver's home, in-home pet sitting, and both in-home one-on-one dog training, as well as remote dog training (the "Pet Care Services").  The Wag! Platform allows Pet Parents to connect directly with Pet Caregivers to specify parameters and instructions for Pet Care Services, receive real-time updates, and, following the completion of a service, receive a report card.  After a service, Pet Parents can provide written reviews of the Pet Caregivers, helping the Pet Caregivers build their profile and personal business.

12.     Pet Parents have the option to subscribe to the Debtors' premium subscription ("Wag! Premium"), which offers Pet Parents a discount ranging from 5-10% off all Pet Care Services, as well as other features, such as waived booking fees, free advice from licensed pet experts, priority access to top-rated Pet Caregivers, and VIP Pet Parent support, which connects Pet Parents with the Debtors' top customer service team members for around the clock assistance with Pet Care Services and subscription management.

13.     In 2024, the Debtors generated approximately $19.4 million in revenue from Pet Care Services, inclusive of fees charged for Wag! Premium.

      ii.    *Wag! Wellness Services*

14.     The Debtors provide Pet Parents with a suite of wellness services, including around the clock access to licensed pet experts and access to the nation's largest pet insurance comparison

resources ("Wag! Wellness Services") that are accessible through the Wag! Platform.  A summary of the Wag! Wellness Services is outlined below.

a.      *Vet Chat*

15.    Pet Parents can connect and speak with licensed pet experts about their pets' behavior, health, and other needs around the clock on the Wag! Platform ("Vet Chat") as an alternative to in-office veterinary visits for a fee of $30.00, or for Pet Parents subscribed to Wag! Premium, free of charge.

b.      *Pet Insurance Comparison*

16.    Debtor Compare Pet Insurance Services, Inc. ("CPIS") is a licensed insurance broker, which assists Pet Parents with finding and comparing pet insurance plans through certain third-party affiliates, the Wag! Platform, Petted.com, one of the nation's largest pet insurance comparison marketplaces, PetInsurer.com, and WeCompare.com.[4]  Pet Parents are able to instantly compare insurance quotes and coverage from top-rated pet insurance providers and to purchase insurance policies directly from the insurance providers.  Debtor We Compare, Inc. ("We Compare") hosts the WeCompare.com domain, one of the domains on which CPIS and We Compare provide their services.  In addition to the pet insurance comparison services offered by CPIS, We Compare also offers Pet Parents automobile insurance comparison services, with intentions to expand into other parallel markets to continue to serve Pet Parents' needs.

c.      *Wag! Wellness Plans*

17.    Pet Parents can pay a monthly fee of $14.95, $29.95, or $59.95, which are subject to change, for a desired twelve-month pet care plan—which range from gold, platinum, and

---

[4]    CPIS is not an underwriter of insurance, nor does it act in the capacity of an insurance company.  CPIS refers Pet Parents to different options for pet insurance plans provided and sold through unaffiliated third parties, including insurance carriers, and receives click-through fees or referral fees in connection therewith.

diamond— pursuant to which they are reimbursed by the Debtors within one (1) to three (3) business days of submitting a reimbursement form for various routine veterinary services that are generally not covered by pet insurance (the "Wag! Wellness Plans"),[5] such as, among other things, physical wellness exams, annual shots and boosters, blood and diagnostic testing, and deworming. Pet Parents have the option to add-on four additional benefits for additional fees of $19.95 or $29.95 depending on the service, inclusive of flea, tick, and heartworm medications, grooming, dental cleaning, and spay and neutering procedures.

18.    In 2024, the Debtors generated approximately $42.7 million in revenue from Wag! Wellness Services.

iii.    *Pet Food and Treats Services*

19.    Debtor Pawsome, LLC ("Pawsome") offers Pet Parents access to DogFoodAdvisor.com, one of the nation's most visited and trusted dog food marketplaces for dog food and treat advice, and CatFoodAdvisor.com, which was launched in the third quarter of 2023 and provides Pet Parents with cat food and treat advice (the "Pet Food and Treat Services").

20.    In 2024, the Debtors generated approximately $6.2 million in revenue from Pet Food and Treat Services.

iv.    *Pet Apparel*

21.    Pet Parents can shop for dog apparel ("Pet Apparel") and other essentials on Maxbone.com, where they can purchase, among other things, functional accessories, toys, dog beds, leashes and other dog-walking necessities, stylish clothing, grooming supplies, and freeze-dried food.

22.    In 2024, the Debtors generated approximately $2.2 million in revenue from Pet

---

[5]    Wag! Wellness Plans are not insurance products.

Apparel.

### B.    The Debtors' Customers

23.    The Debtors derive revenue from the services described above, including (i) service fees charged to Pet Caregivers, (ii) subscription fees for Wag! Premium and other fees paid by Pet Parents, (iii) fees charged to Pet Caregivers in connection with applying for access to the Wag! Platform, (iv) wellness revenue through commission fees paid by third-party service partners, (v) pet food and treat revenue through affiliate fees, and (vi) Pet Apparel revenue through Maxbone.com.  For the year ending December 31, 2024, the Debtors generated approximately $70.5 million in revenue, representing a decrease of $13.4 million, or approximately 16% from the year ended December 31, 2023.  Revenue from three Wag! Wellness customers accounted for an aggregate of approximately 38% of the Debtors' total revenue in 2024.

i.    *Pet Parents*

24.    The Debtors are a leading supporter of Pet Parents and the health and well-being of pets, and their success is facilitated by the support of the Pet Parents that look for services through the Wag! Platform.  As of the Petition Date, over 1 million Pet Parents have received over 12 million services through the Wag! Platform, and millions have left five-star reviews, calling the Wag! Platform easy to use, noting that the prices on the Wag! Platform are affordable, and describing the Pet Caregivers as excellent.

25.    To ensure a quality experience for Pet Parents, the Debtors focus on (i) providing the tools for Pet Parents to have peace of mind that their pets are comfortable, including through in-app messaging, (ii) providing access to quality personalized care for pets, including through a customer support team to help Pet Parents and Pet Caregivers address problems that arise during Pet Care Services, (iii) providing access to on-demand services, which allows Pet Parents to care for their pets as soon as care is needed; (iv) maintaining the Wag! Platform and ensuring that it

remains up to date and is easy to use; and (v) offering access to pet care that suits Pet Parents' budgets and lifestyles.

26.     The Debtors enter into terms of service agreements with Pet Parents when they access the Wag! Platform.  These terms also govern the fees that the Debtors charge the Pet Parents, where applicable.  The Debtors also charge Pet Parents subscription fees of $5.99 per month or $59.99 per year in connection with Wag! Premium, which are subject to change.  In addition, the Debtors derive revenue when Pet Parents purchase goods through Maxbone.com.[6] Lastly, the Debtors derive click-through and referral revenue through the Third-Party Service Providers (defined below) when Pet Parents compare insurance plans through the Wag! Platform, Petted.com, WeCompare.com, and other websites, when Pet Parents purchase insurance plans through the underlying insurance carrier, when Pet Parents review pet food and treats through DogFoodAdvisor.com and CatFoodAdvisor.com, respectively, and when Pet Parents purchase pet food and treats through the Debtors' partners.

ii.     *Pet Caregivers*

27.     The Debtors' business operations are built on the foundation of Pet Caregivers who provide services through the Wag! Platform.  As of the Petition Date, approximately 500,000 Pet Caregivers nationwide have been approved to access the Wag! Platform.  Before becoming approved to offer services on the Wag! Platform, Pet Caregivers are required to pass an extensive background check.  Once approved, Pet Caregivers create a profile on the Wag! Platform, set their own rates, schedule and book service opportunities, and communicate with Pet Parents.  Pet Caregivers receive payment for their services through the Debtors' third-party payment service

---

[6]     The Debtors partner with a third-party logistics distributor to receive, hold, and ship the physical inventory bought by Pet Parents through Maxbone.com.

provider, Stripe, Inc. ("Stripe").  The Debtors' flexible model allows Pet Caregivers to manage bookings that are a fit for their preferences and schedule.  Certain Pet Caregivers provide services through the Wag! Platform as their full-time job, while others provide services to earn extra income.  Pet Caregivers can subscribe to Wag! Pro, a premium lifetime subscription with a price ranging from $129.00–$199.00, which is subject to change, through which Pet Caregivers receive various benefits, including priority approvals and profile promotions.

28.     The Debtors enter into terms of service agreements and independent contractor agreements with the Pet Caregivers that govern the fees charged to the Pet Caregivers.  The Debtors charge Pet Caregivers upfront fees for applying to access the Wag! Platform in addition to a recurring percentage fee when Pet Caregivers successfully complete a service for a Pet Parent, which fee is netted from the funds paid by the Pet Parents through Stripe.

iii.     *Third-Party Service Providers*

29.     The Debtors partner with, and derive revenue from, third-party service providers (the "Third-Party Service Providers").  With respect to the Pet Food and Treat Services that are offered on DogFoodAdvisor.com and CatFoodAdvisor.com, the Debtors partner with reputable brands like Chewy, Petco, and The Farmer's Dog.  With respect to CPIS's and We Compare's insurance comparison services, the Debtors partner with pet insurers such as ASPCA Pet Health Insurance, Fetch, Pets Best, Healthy Paws, and others.  The Debtors, through Petted.com, PetInsurer.com, WeCompare.com, and other websites, help Pet Parents connect with top insurance providers to select insurance plans for their pets, and receive fees in connection therewith, including click-through fees and activation fees when a Pet Parent purchases pet insurance through the Debtors' referral.  The Debtors also receive revenue from partnerships with respect to their Pet Food and Treats Services in the form of click-through and referral fees.

## II.     The Debtors' Corporate Structure and History

### A.     The Debtors' Corporate Structure

30.     A corporate organizational chart is attached hereto as **Exhibit 1**.

31.     Debtor Wag! is a public corporation incorporated in Delaware with headquarters in San Francisco, California.  Shares of Wag!'s common stock and warrants are listed on The Nasdaq Global Market ("NASDAQ") and have been traded under the ticker symbols "PET" and "PETWW" since August 10, 2022.[7]

32.     Wag! went public after CHW Acquisition Corporation ("CHW"), a Cayman Islands special purpose entity formed on or around January 21, 2021 for the purpose of effectuating a de-SPAC transaction (the "de-SPAC"), had its initial public offering ("IPO") on September 1, 2021.  In connection with the IPO, CHW issued 12,500,000 units at $10.00 per unit, generating $125,000,000 in gross proceeds.  On August 9, 2022, CHW, CHW Merger Sub, Inc. ("CHW Merger Sub"), and Wag Labs consummated the de-SPAC and Wag Labs merged with CHW Merger Sub, with Wag Labs surviving the de-SPAC as a wholly owned subsidiary of CHW, which changed its name to Wag! Group Co., in a deal valued at $350 million.

33.     All of the other Debtors are wholly owned by Wag Labs, with the exception of We Compare, which is wholly owned by CPIS.  Pawsome and Wag Wellness, LLC ("Wag Wellness") are Delaware limited liability companies; the other Debtors are Delaware corporations.

### B.     The Debtors' History

34.     Between 2014–2017, the Debtors' co-founders held several funding rounds and raised approximately $68 million in total funding from investors to launch and grow the Debtors'

---

[7]     Wag! is authorized to issue 1 million shares of preferred stock for a par value of $0.0001 per share.  As of the Petition Date, there are no shares of preferred stock issued and outstanding.

then start-up business.  In January 2018, a Series D investor invested $300 million in exchange for approximately 45% of equity in Wag Labs.  In December 2019, as part of the Debtors' efforts to right-size their capital base, the Series D investor sold back their interest to the Debtors, and the parties amicably parted ways.  Subsequently, as set forth above, in 2021, CHW was created for the purpose of effectuating the de-SPAC and, upon completion of the de-SPAC, CHW changed its name to Wag! Group Co. with Wag Labs having survived the de-SPAC as its wholly owned subsidiary.

35.     Wag Labs acquired CPIS in the third quarter of 2021 to expand into the pet insurance comparison marketplace and created We Compare in the second quarter of 2024 to leverage the Debtors' insurance expertise and technology to further expand into the insurance comparison space by offering insurance comparisons that initially focus on pet and auto insurance companies but are intended to expand into other insurance verticals, such as home, travel, and life, to continue to meet the demands of the Debtors' partners' audiences.

36.     Wag Wellness was formed in 2021 as a Delaware corporation when the Debtors first entered the wellness space and was thereafter converted to a Delaware limited liability company in the fourth quarter of 2024.  Wag Wellness provides Pet Parents with a suite of Wag! Wellness Services, such as the Wag! Wellness Plans and Vet Chat services described above.

37.     Pawsome was formed in 2022 as a Delaware corporation in connection with the Debtors' acquisition of the Dog Food Advisor assets from Clicks and Traffic LLC and thereafter converted to a Delaware limited liability company in the fourth quarter of 2024.  Through Pawsome, the Debtors offer Pet Parents services from Dog Food Advisor and Cat Food Advisor, which research and review various dog and cat food products to offer Pet Parents knowledge on food and treat safety.

38.     In the fourth quarter of 2022, the Debtors acquired Debtor Furmacy, Inc. ("Furmacy"), through which the Debtors provided prescription management software for business-to-business partners in the veterinary space.

39.     In the second quarter of 2023, in connection with the Debtors' expansion into the pet apparel space, the Debtors acquired Maxbone, Inc., a premium pet apparel retailer, which merged into Wag Labs.  In the first quarter of 2024, the Debtors acquired Rowlo Woof Ltd, the maker of social media space WoofWoofTV, which merged into Wag Labs, thereby marking the Debtors' entrance into the media space.

## III.     Prepetition Indebtedness

### A.     The Prepetition Financing Agreement

40.     In connection with the de-SPAC, to obtain debt financing, the Debtors entered into that certain *Financing Agreement*, dated as of August 9, 2022 (as amended, restated, amended and restated, or otherwise modified from time to time, the "Prepetition Financing Agreement"), by and among Wag! as parent guarantor, Wag Labs as borrower, and the other Debtors as guarantors, Blue Torch Finance, LLC ("Blue Torch") as collateral agent, and the lender parties thereto, pursuant to which Blue Torch and the lenders agreed to extend approximately $32.2 million in the form of a senior secured term loan to the Debtors.  The Prepetition Financing Agreement is secured by a first priority security interest in substantially all of the Debtors' assets (the "Prepetition Collateral") and matures in August 2025, at which time the remaining principal balance of approximately $16.3 million, plus interest, fees, and costs (the "Prepetition Financing Agreement Obligations") will be due and payable.  The Prepetition Financing Agreement bears interest at a

floating rate of interest equal to Secured Overnight Financing Rate plus 10.00% per annum or the reference rate plus 9.00% per annum, at the Debtors' option, as further described therein.[8]

41.     On April 11, 2025, pursuant to that certain *Assignment and Acceptance Agreement* (the "Assignment"), Retriever LLC (the "Plan Sponsor" or the "Prepetition Secured Creditor", as applicable) acquired the debt and obligations outstanding under the Prepetition Financing Agreement from Blue Torch and, on July 7, 2025, appointed Alter Domus (US) LLC as collateral agent and as administrative agent under the Prepetition Financing Agreement (the "Administrative Agent").

42.     In the spring and summer of 2025, the Debtors' minimum liquidity amount fell below the amount required to be maintained under the Prepetition Financing Agreement—a specified event of default under the Prepetition Financing Agreement.  As a result, the Debtors, the Prepetition Secured Creditor, and the Administrative Agent amended the Prepetition Financing Agreement on April 4, 2025 (the "First Amendment") and July 8, 2025 (the "Third Amendment").[9]

43.     Under the First Amendment, the Prepetition Secured Creditor agreed to amend the minimum liquidity covenant level required under section 7.03 of the Prepetition Financing Agreement from $5 million (the "Minimum Liquidity Covenant") to $4.5 million until April 18, 2025, and to grant the Debtors' a limited waiver of the event of default arising from their non-compliance with the Minimum Liquidity Covenant.  The Third Amendment further amended the

---

[8]     Upon the closing of the Prepetition Financing Agreement, the Debtors also entered into the *Lender Warrant Agreement* with Vstock Transfer, LLC as warrant agent, pursuant to which affiliates of Blue Torch received 1,896,177 warrants to acquire Wag! common stock, par value $0.0001 per share for $11.50 per whole share (such warrants, the "Lender Warrants").  At the date of issuance, the Debtors classified the Lender Warrants as equity.

[9]     The Debtors, the Prepetition Secured Creditor, and the Administrative Agent also amended the Prepetition Financing Agreement on July 7, 2025 (the "Second Amendment").  The effective date of the Second Amendment is April 4, 2025.  The Second Amendment appointed the Administrative Agent as the successor collateral agent and administrative agent under the Prepetition Financing Agreement and made other technical changes to the Prepetition Financing Agreement to reflect the Assignment.

Minimum Liquidity Covenant to $1 million between June 4, 2025 and August 9, 2025 while the Debtors and the Prepetition Secured Creditor implemented a restructuring as contemplated by the Prepackaged Plan and granted the Debtors' a further limited waiver of the event of default arising from their non-compliance with the Minimum Liquidity Covenant implemented under the First Amendment.

**B.      The PPP Loan**

44.     On August 5, 2020, the Debtors received loan proceeds of approximately $5.1 million pursuant to the Paycheck Protection Program (the "PPP Loan") established by the Coronavirus Aid, Relief, and Economic Security Act, of which $3.5 million was subsequently forgiven.  The PPP Loan matures on August 5, 2025 and bears interest at a fixed rate of 1.00%. The Debtors pay principal and interest payments monthly, and the amount outstanding under the PPP Loan as of the Petition Date is approximately $40,000 (the "PPP Loan Obligations").

**C.      Other Unsecured Debt**

*45.*     As of the Petition Date, the Debtors' books and records list approximately $7 million in non-contingent, undisputed, liquidated unsecured debt to vendors, taxing authorities, insurers, employees, and other contract counterparties.

46.     The chart below sets forth the Debtors' debt obligations as of the Petition Date:

| Debt Obligation and Order of Priority | Approximate Amount of Obligations Outstanding as of the Petition Date |
|---|---|
| Prepetition Financing Agreement Obligations | $16.3 million, plus interest, fees, costs, and expenses |
| PPP Loan Obligations | $40,000, plus interest, fees, costs, and expenses |
| Unsecured Debt | $7 million |

**IV.    Circumstances Leading to the Filing of these Chapter 11 Cases**

47.    Since their inception, the Debtors have incurred net losses, and the Debtors' monthly revenues declined rapidly after March 2020 as a result of the COVID-19 pandemic. Specifically, the Debtors incurred net losses of $17.6 million, $13.3 million, and $38.6 million for the years ended December 31, 2024, 2023, and 2022, respectively.

**A.    The Public Offering and the Furscription Sale**

48.    To help alleviate the Debtors' liquidity concerns, in July 2024, the Debtors completed a registered public offering (the "Public Offering") of 7.4 million shares of common stock. This financing raised net proceeds of approximately $8.6 million and was used to pay down the Prepetition Financing Agreement Obligations.  Additionally, on July 14, 2025, Wag Labs entered into that certain *Asset Purchase Agreement* with MWI Veterinary Supply Co. ("Purchaser"), pursuant to which it sold to the Purchaser assets related to the Debtors' prescription management and digital e-scribing software (the "Furscription Sale") for an aggregate sale price of $5,000,000 (the "Furscription Sale Proceeds"), approximately $3,500,000 of which was used to pay down the Prepetition Financing Agreement Obligations, less approximately $70,000 in bonus payments that were made to employees of the Debtors who were retained by the Purchaser in connection with the Furscription Sale.[10]  However, the proceeds realized from the Public Offering and the Furscription Sale were insufficient to address the Debtors' overall liquidity situation.

**B.    The Prepetition Marketing and Financing Process**

49.    In the year preceding the Petition Date, the Debtors' board of directors (the "Board") was actively seeking strategic transactions or a refinancing of the Prepetition

---

[10]    The Prepetition Secured Creditor required the Debtors to apply the Furscription Sale Proceeds to pay down the Prepetition Financing Obligations but permitted the Debtors to retain $1,000,000 of the Furscription Sale Proceeds as a form of bridge financing to provide the Debtors with breathing room until the filing of these Chapter 11 Cases.

Financing Agreement to alleviate the Debtors' liquidity issues.  To that end, the Board retained BofA Securities, Inc. ("BofA") in August 2024 as the Debtors' financial advisor to assist with a potential transaction, which the Board contemplated as a business combination with an unaffiliated third-party purchaser or the sale of substantially all of the Debtors' assets to an unaffiliated third-party purchaser (a "Transaction").

50.     Between September 2024 and May 2025, BofA contacted sixteen (16) different potentially interested parties to explore their interest in a Transaction.  Seven (7) parties signed non-disclosure agreements and were provided with access to a data room containing extensive information about the Debtors' operations.  Four (4) of those parties held meetings with the Debtors' management, and ultimately the Debtors received three (3) non-binding indications of interest ("IOIs").

51.     Following diligence, all parties who submitted IOIs determined not to pursue a Transaction with the Debtors.  One party explored various financing options to fund a whole-company sale of the Debtors but was unsuccessful in securing financing.  Another party indicated that they would only pursue a Transaction of a sale of substantially all of the Debtors' assets free of any liabilities.  The last party who submitted an IOI chose not to pursue a Transaction due to their limited interest in several of the Debtors' business.

52.     Separate from the BofA marketing process, at the start of 2024, the Board also began a financing process (the "Financing Process") in an effort to refinance the Prepetition Financing Obligations.  To assist with running the Financing Process, the Board engaged Arc Capital Markets ("Arc").  The Board, with Arc's assistance, contacted twenty-six (26) different parties, including new and existing banking partners, to gauge interest in providing the Debtors

with refinancing terms or other strategic alternatives.  The Financing Process continued throughout 2024.

53.     Unfortunately, after a nearly year-long marketing process, the Board was unable to find any potential purchasers for the Debtors' business as a whole or for a sale of substantially all of the Debtors' assets.  The Board was also unable to refinance the Prepetition Financing Agreement despite the fulsome Financing Process.

**C.      Trading Price of Wag! Common Stock**

54.     Since August 2024, Wag!'s common stock has been trading at below $1 per share and has not closed above $.20 since March 2025.  As reported on Wag!'s Form 8-K filed with the Securities and Exchange Commission on March 28, 2025, Wag! has received several delisting notices from NASDAQ.

**D.      The Maturity of the Prepetition Financing Agreement Obligations and the Debtors' Engagement of Restructuring Professionals**

55.     As of the Petition Date, the Debtors had cash and cash equivalents of approximately $1.7 million and accounts payable of $2.2 million.  In light of the Prepetition Financing Agreement Obligations maturing in August 2025, without an actionable third-party proposal or refinancing, the Debtors were facing a dire liquidity crisis and determined that a restructuring transaction was necessary to continue their operations as a going concern.

56.     To that end, the Board began discussing a consensual restructuring transaction with the Prepetition Secured Creditor.   In connection therewith, the Board retained Young Conaway Stargatt & Taylor, LLP as the Debtors' restructuring counsel on or about May 27, 2025 and Triple P TRS, LLC ("Portage Point") as the Debtors' restructuring advisors on or about June 16, 2025. After discussing various options, the parties determined that the best path for addressing the Debtors' liquidity issues was an expeditious plan of reorganization that would minimize any

disruption to operations and any impact on the Debtors' essential vendor and customer relationships.

## V.     The Prepackaged Plan and the Prepetition Solicitation Thereof

### A.     The Prepackaged Plan[11]

57.     Over the last several months, the Board and the Debtors' advisors continued to engage extensively with the Prepetition Secured Creditor to consensually restructure the Debtors' balance sheet and preserve the Debtors' businesses as a going concern.  After months of good faith and arm's length negotiations, the Prepetition Secured Creditor agreed to the following Restructuring.

> *i.*     *Restructuring of Current Debt and Cancellation of Existing Equity Interests*
>
>> a.  Each Holder of an Allowed Financing Agreement Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Financing Agreement Claim, its *pro rata* share of (i) 100% of the New Common Stock to be issued and outstanding on the Effective Date, and (ii) $5 million principal amount of New Notes.
>>
>> b.  On or after the Effective Date of the Prepackaged Plan, the Reorganized Debtors will enter into the Exit Facility, which will provide the Reorganized Debtors with up to $18.3 million of senior secured credit facilities, inclusive of $5 million principal amount of New Notes issued to the Holder of Allowed Financing Agreement Claims.
>
> *ii.*     *Treatment of Other Claims and Interests*
>
>> a.  Allowed Administrative Claims will be paid in Cash on the latest of the Effective Date, the date on which such Administrative Claim becomes Allowed, or on the date on which an Allowed Administrative Claim becomes payable in the ordinary course of business, unless otherwise agreed to by the Holder of such Claim and the Debtors or the Reorganized Debtors, as applicable;
>>
>> b.  Priority Tax Claims, Non-Tax Priority Claims, Other Secured Claims, and

---

[11]   Capitalized terms used but not defined in this section have the meanings ascribed to such terms in the Prepackaged Plan.  The summary provided herein is not exhaustive and the Prepackaged Plan should be consulted for a fulsome understanding of the transactions contemplated therein.

General Unsecured Claims will be unimpaired;

c. The DIP Claims shall be either (i) paid in full in Cash or (ii) the DIP Lender shall receive New Notes in a principal amount equal to the Allowed DIP Claims.

d. The Non-Go Forward Claim will be cancelled;

e. Intercompany Claims, if any, will either be Reinstated, cancelled, or contributed to the capital of the obligor;

f. All of the current Interests in the Subsidiary Debtors will be Reinstated; and

g. All of the current Interests in Wag! will be cancelled.

iii. *Post-Effective Date Corporate Structure*

a. Wag! will become a private company owned by the Plan Sponsor and will be delisted from NASDAQ with the same corporate ownership structure as outlined herein.

58. The Restructuring is expected to eliminate the Prepetition Financing Agreement Obligations in exchange for the equity in Reorganized Wag! and the New Notes. Through the Restructuring, the Debtors will emerge from these Chapter 11 Cases a stronger company, with a more sustainable capital structure that is better aligned with the Debtors' present and future operating prospects.

59. Pursuant to the Prepackaged Plan, it is contemplated that all Claims with respect to the Debtors other than Claims held by the Prepetition Secured Creditor and the Non-Go Forward Claim will be either paid in full on the effective date of the Prepackaged Plan or otherwise rendered unimpaired.

**B.      Prepetition Solicitation of the Prepackaged Plan.**

60. On July 20, 2025, the Debtors began soliciting votes on the Prepackaged Plan by instructing their voting agent, Epiq Corporate Restructuring, LLC ("Epiq"), to distribute a solicitation package containing the Disclosure Statement, including the Prepackaged Plan and

other exhibits thereto, and one or more ballots, as applicable, to each holder of an impaired claim that is entitled to vote – *i.e.* Class 3– determined as of the voting record date of July 20, 2025.

61.     Following the occurrence of the voting deadline on July 20, 2025, Epiq informed the Debtors that solicited holders had timely submitted ballots and that the impaired class had voted unanimously to accept the Prepackaged Plan:

| Voting Class | Claims | Amount Accepting Plan (% of Amount Voted) | Amount Rejecting Plan (% of Amount Voted) | Number Accepting Plan (% of Number Voted) | Number Rejecting Plan (% of Number Voted) |
|---|---|---|---|---|---|
| 3 | Financing Agreement Claims | 100% | 0% | 100% | 0% |

62.     Contemporaneously herewith, the Debtors filed a motion, described in greater detail below, seeking entry of an order (i) scheduling a combined hearing for the Court to consider approval of the Disclosure Statement and the prepetition solicitation procedures, as well as confirmation of the Prepackaged Plan, and (ii) establishing related objection and other deadlines, with the goal of emerging from these Chapter 11 Cases as soon as practicable and within the milestones agreed to by the Plan Sponsor.

**VI.    First Day Pleadings**

63.     Concurrently with their chapter 11 petitions, the Debtors filed the following First Day Pleadings:

*(i)    Administrative Pleadings*

    a.    *Debtors' Motion for an Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases* ("Joint Administration Motion"); and

    b.    *Debtors' Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent, Effective as of the Petition Date* ("Epiq Retention Application"); and

    c.    *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Redact Certain Personally Identifiable Information, (II) Authorizing Electronic Noticing*

*Procedures for Pet Participants, and (III) Granting Related Relief* ("Electronic Noticing Motion").

*(ii)    Operational and Scheduling Pleadings*

a.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Employment Obligations and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief* ("Wages Motion");

b.    *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue and Maintain Their Cash Management System, Including Bank Accounts and Business Forms, (B) Continue Intercompany Transactions, and (C) Honor Certain Prepetition Obligations Related Thereto, (II) Waiving Certain Operating Guidelines, (III) Extending the Time to Comply with Section 345(b) of the Bankruptcy Code, and (IV) Granting Related Relief* ("Cash Management Motion");

c.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue and Pay All Prepetition Obligations Relating to Their Prepetition Insurance Policies; (II) Authorizing the Debtors' Banks and Other Financial Institutions to Honor and Process Checks and Transfers Related Thereto; and (III) Granting Related Relief* ("Insurance Motion");

d.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief* (the "Customer Programs Motion");

e.    *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief* ("Taxes Motion");

f.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Trade Claims in the Ordinary Course of Business and (II) Granting Related Relief* ("All Trade Motion");

g.    *Debtors' Motion for Entry of an Order (I) Scheduling Combined Hearing on Adequacy of the Disclosure Statement and Confirmation of the Plan; (II) Fixing Deadline to Object to Disclosure Statement and the Plan; (III) Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing and Objection Deadline; (IV) Approving Notice of Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (V) Conditionally (A) Directing the United States Trustee Not to Convene a Section 341(a) Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities and*

*Rule 2015.3 Reports; and (VI) Granting Related Relief*
("<u>Scheduling and Confirmation Motion</u>"); and

h.  *Debtors' Motion for Entry of Interim and Final Orders (I) Granting Expedited Relief, (II) Approving Postpetition Financing, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Authorizing Use of Cash Collateral, (V) Granting Adequate Protection, (VI) Modifying Automatic Stay, and (VII) Granting Related Relief* ("<u>DIP Motion</u>").

64.    As noted above, the relief sought in the various First Day Pleadings will allow the Debtors to, among other things, (i) establish certain administrative procedures to promote a seamless transition into and through chapter 11, (ii) ensure the continuation of their business operations and cash management system without interruption, (iii) obtain debtor-in-possession financing and use cash collateral in the operation of the Debtors' businesses during the Debtors' short time in chapter 11, (iv) preserve valuable relationships with trade vendors and other creditors whose claims are not expected to be impaired by these Chapter 11 Cases, and (v) schedule a combined hearing for the Court to consider the adequacy of the Disclosure Statement, approval of the Debtors' prepetition solicitation procedures, and confirmation of the Prepackaged Plan.

65.    I have reviewed each First Day Pleading or had their contents explained to me, and I believe that the Debtors would suffer immediate and irreparable harm in the event the relief sought therein is not granted.  In my opinion, the relief sought in the First Day Pleadings is critical to the Debtors' efforts to reorganize through these Chapter 11 Cases efficiently and with minimized disruptions to their business operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all stakeholders and successfully emerge from chapter 11 as a more competitively positioned going concern.

66.    Several First Day Pleadings request authority to pay certain prepetition claims. I am told by the Debtors' advisors that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the

filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated in such pleadings.

### a.    Joint Administration Motion[12]

67.    Many of the motions, applications, hearings, and orders in these Chapter 11 Cases will jointly affect each of the Debtors, who I understand are "affiliates" within the meaning of the Bankruptcy Code.  Under these circumstances, the interests of the Debtors, their estates, their creditors, and other parties in interest would be best served by the joint administration of these Chapter 11 Cases for procedural purposes only.  Joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest.

68.    For these reasons, the Debtors submit, and I believe, that the relief requested in the Joint Administration Motion is in the best interest of the Debtors, their estates, and their creditors and, therefore, should be approved.

### b.    Epiq Application

69.    The Debtors request entry of an order authorizing the retention and appointment of Epiq as their claims and noticing agent in these Chapter 11 Cases.  The Debtors selected Epiq after soliciting proposals from Epiq and two other potential claims and noticing agents.  I have been advised and understand that the relief requested in Epiq's retention application will ease the

---

[12]    Any capitalized term used in this Part VI but not defined herein shall have the meaning ascribed to that term in the relevant First Day Pleading.

administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases.  In addition, I have been advised by counsel that Epiq's retention is required by the Local Rules in light of the aggregate number of the Debtors' creditors.  Epiq has already gained familiarity with the Debtors and their creditors through its prepetition solicitation of votes to accept or reject the Prepackaged Plan.  Accordingly, the Debtors believe that the application should be approved on the terms proposed.

### c.   Electronic Noticing Motion

70.     The Debtors are requesting to provide notice in these Chapter 11 Cases to the Debtors' approximately 500,000 Pet Parents and Pet Caregivers (together, the "Pet Participants") through electronic mail rather than traditional hard copy mail.  Based on my discussions with the Debtors' advisors and my understanding of the Debtors' ordinary course communications practices with its Pet Participants, I understand that the Debtors communicate with Pet Participants electronically in the ordinary course of business.  I also understand that the Debtors maintain e-mail addresses for Pet Participants that are provided to the Debtors directly by Pet Participants when a profile on the Wag! Platform is created or when retail apparel is purchased from Maxbone.com. As a result, I believe that Pet Participants are likely to expect to receive communications in these Chapter 11 Cases through e-mail and may not expect to receive communications from the Company by traditional forms of mail.  Thus, based on my knowledge and experience, I believe that providing the Pet Participants with notice electronically at the e-mail addresses maintained by the Debtors is the most appropriate and reliable method of providing notice under the circumstances.

71.     Furthermore, it is my understanding and belief that serving notice of pleadings and hearings by traditional mail to the Pet Participants would impose a significant financial burden on the Debtors' estates.  Specifically, I understand from my discussions with the Debtors' advisors,

including Epiq, that every time the Pet Participants are served with a two-to-ten-page document in these Chapter 11 Cases via traditional mail, the service cost will total approximately $600,000– $1,000,000 per mailing.  I believe that service costs of this magnitude are cost prohibitive, especially in light of the Debtors' liquidity concerns, and may hinder the Debtors' reorganization efforts.

### d.    Wages Motion

72.    The continued and uninterrupted support of the Debtors' employees is essential to the Debtors' success, and, therefore, the Debtors therefore seek authority to continue paying wages and benefits to their employees in the ordinary course of business.  The Debtors' employees' skills and experience, their relationships with key customers and vendors who contribute to the success of the Debtors' business, and their knowledge of the intricacies of the Debtors' business operations are essential to the preservation and maximization of the value of the Debtors' estates. Interruptions in payments of prepetition employee-related obligations will impose hardship on employees and will jeopardize their continued performance during this critical time.

73.    To minimize the personal hardship that the Debtors' employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain employee morale during this critical time, it is important that the Debtors be permitted to pay and/or perform, as applicable, their employee-related obligations, on the terms proposed in the Wages Motion and the orders approving such requested relief, including with respect to the following, whether arising pre- or post-petition:  (i) wages, salaries, paid time off, and other compensation; (ii) employee business expenses; (iii) contributions to prepetition benefit programs provided to employees; (iv) workers' compensation obligations; (v) payments for which prepetition payroll deductions were made; (vi) processing costs and administrative expenses relating to the foregoing payments

and contributions; and (vii) payments to third parties incident to the foregoing payments and contributions.

74.     Through the Wages Motion, the Debtors seek authority to pay a total of $642,350 on account of prepetition workforce compensation and benefits on an interim and final basis.

  **e.**  **Cash Management Motion**

75.     In the ordinary course of business, the Debtors maintain a centralized cash management system (the "Cash Management System") involving eleven (11) Bank Accounts. Like other businesses of their size, the Debtors designed their Cash Management System to efficiently collect, transfer, and disburse funds generated through the Debtors' operations and to accurately record such collections, transfers, and disbursements as they are made.  The Debtors' bank accounts are maintained at JPMorgan Chase Bank, N.A., Morgan Stanley Bank, N.A. ("Morgan Stanley"), Wells Fargo Bank, N.A., Bank of America, N.A., Silicon Valley Bank, a division of First Citizens Bank and Trust Company ("SVB"), and Column, N.A. ("Column" and, collectively, the "Banks"), which—with the exception of the operating account held by Furmacy at Column and the Investment Accounts—are parties to Uniform Depository Agreements with the U.S. Trustee, and all of the Debtors' Bank Accounts are FDIC-insured.  I have been advised that the Investment Accounts at SVB and Morgan Stanley satisfy the requirements of Local Rule 4001-3.

76.     In light of the size and complexity of the Debtors' operations, significant disruptions to the Debtors' business is likely if the Debtors are required to quickly alter their cash management procedures and, accordingly, I believe that it is essential that the Debtors be permitted to maintain their Cash Management System in its current format.  The Debtors further seek authority to implement ordinary course changes to their Cash Management System and to open and close bank accounts in the manner described in the Cash Management Motion.  The Debtors

also request authority for the Banks to charge and the Debtors to pay or honor service and other fees, costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with their respective contractual arrangements with the Debtors.

77.      As detailed in the Cash Management Motion, in the ordinary course of their business, the Debtors maintain business relationships between and among themselves.  As part of these business relationships, the Debtors participate in a variety of intercompany transactions (the "Intercompany Transactions") that may generate intercompany receivables and payables (the "Intercompany Claims").  The Debtors maintain strict records of any Intercompany Claims and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

78.      The Cash Management System provides the mechanism for cash to flow through the Debtors so that operations may be maintained.  To lessen the disruption caused by these Chapter 11 Cases and to maximize the value of the Debtors' estates, I believe that it is essential that the Debtors be allowed to continue to implement Intercompany Transactions in the ordinary course.

### f.      Insurance Motion

79.      In the ordinary course of business, the Debtors maintain a comprehensive insurance program (the "Insurance Program").  This program includes multiple insurance policies (each a "Policy" and, collectively, the "Policies").  The Policies vary in amounts and types of coverage in accordance with prudent business practices, international, state, and local laws governing the jurisdictions in which the Debtors operate, and various contractual obligations.  The Policies include: general liability; excess liability, property damage liability; directors' and officers'

liability, cyber liability, employment practices liability, and fiduciary liability, among others.  A listing of all known policies currently in effect is attached as an exhibit to the Insurance Motion.

80.     In connection with the Insurance Programs, the Debtors obtain brokerage and risk management services from HUB International Insurance Services Inc. and CAC Specialty (together, the "Brokers").  The Brokers assist the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors with the design and development of the Insurance Program, and the procurement and negotiation of the Insurance Program, and enabling the Debtors to obtain those policies on advantageous terms at competitive rates.  As of the date hereof, I believe that no fees are owed with respect to the Brokers, and $35,000 in accrued and unpaid prepetition amounts are owed with respect to insurance premiums. The Debtors are seeking relief to pay any amounts due under their Insurance Policies and to the Brokers in the ordinary course of business.

81.     The Insurance Policies are essential to preserve the value of the Debtors' business and assets, and are, in some cases, required by various laws, regulations or contracts that govern the Debtors' business (and I am advised that certain insurance policies are also required by the Guidelines established by the Office of the United States Trustee for chapter 11 bankruptcy cases). It is critical that the Insurance Policies be maintained and renewed on an ongoing and uninterrupted basis.  Therefore, the Debtors request that the Court authorize them to pay all prepetition premiums, fees, and expenses arising under, or related to, the Insurance Policies, if any, including with respect to any Brokers' fees, in the amounts set forth in the Insurance Motion.  For these reasons, I believe that the relief requested is in the best interests of the Debtors, their estates, and creditors and, therefore, should be approved.

g.     **Customer Programs Motion**

82.     Prior to the Petition Date, and in the ordinary course of business, the Debtors sought to maximize the value of their customer relationships and to develop and sustain a positive reputation in the marketplace through the implementation of certain programs for Pet Parents, Pet Caregivers, and corporate customers (the "Customer Programs").  On account of the Customer Programs, the Debtors may owe certain obligations arising both before and after the Petition Dae (the "Customer Obligations").  The Debtors' Customer Programs include (a) Wag! Premium; (b) Wag! Pro;  (c) Refunds;  (d) Wag! Wellness Reimbursements;  (e) a Referral Program; (f) Credits; (g) Chargebacks; (h) Promotions; and (i) a Gift Card Program.

83.     The Customer Programs promote customer satisfaction, create goodwill for the Debtors' business, and enhance the value of their brand.  The Debtors operate in a highly competitive marketplace, where the Debtors' customers can turn to competitors in the industry in which the Debtors' business operates.  The Debtors' failure to either honor their prepetition Customer Obligations or continue the Customer Programs in the ordinary course during these Chapter 11 Cases will put the Debtors at a significant competitive disadvantage.  The Debtors seek authority to continue the Customer Programs in the ordinary course of business and to pay claims arising out of Customer Programs to avoid any harm or disruption to their business.  I believe that the continuation of the Customer Programs is crucial to the Debtors' ongoing operations in these Chapter 11 Cases and is necessary to maximize the value of the Debtors' business for the benefit of all stakeholders. Through the Customer Programs Motion, the Debtors seek authority to pay

$24,000 in the aggregate on an interim basis and approximately $24,000 on a final basis, inclusive of the amounts paid on an interim basis, on account of the Customer Obligations.[13]

### h.    Taxes Motion

84.    In the ordinary course of business, the Debtors incur or collect and remit a variety of taxes, including, without limitation, federal and state corporate income taxes, sales and use taxes, and certain other miscellaneous taxes (collectively, the "Taxes").  The Debtors also incur fees for business licenses, including with respect to CPIS's licenses, and permits and various other fees and assessments (collectively, the "Fees," and together with the Taxes, the "Taxes and Fees"), in connection with the operation of their business.  The Debtors remit the Taxes and Fees to certain authorities in accordance with applicable law.

85.    As of the Petition Date, the Debtors estimate that approximately $132,000 in accrued and unpaid prepetition Taxes and Fees is owed, $71,000 of which will come due in the interim period, and seek authority to pay such amounts in the ordinary course of business.  For the avoidance of doubt, the Debtors are not seeking authority to pay any amounts on account of past-due taxes or to prepay any taxes that do not constitute trust fund taxes and non-estate property.

86.    The Debtors have ample business justification to pay the Taxes and Fees because it is my understanding that: (i) certain of the Taxes and Fees do not constitute property of the Debtors' chapter 11 estates; (ii) substantially all of the Taxes and Fees constitute priority claims; (iii) the failure to pay certain of the Taxes and Fees may impact the Debtors' ability to conduct business in certain jurisdictions and their ability to perform under their postpetition agreements; (iv) the Debtors' directors and officers may face personal liability if certain of the Taxes and Fees

---

[13]    For the avoidance of doubt, the Debtors are seeking to honor all amounts related to Gift Cards and Credits without regard to the dollar amount outstanding in respect thereof.

are not paid; and (v) all Priority Tax Claims and general unsecured claims (other than the Non-Go Forward Claim) are unimpaired under the Prepackaged Plan.  Absent payment of these amounts, the Debtors may face serious disruptions and distractions during the administration of these Chapter 11 Cases, as well as hinder the Debtors' efforts to maximize estate value through these restructuring proceedings.  I believe that the Taxes Motion should be approved because it is in the best interests of the Debtors, their estates, and creditors.

    **i.**  **All Trade Motion**

87.  As detailed therein, in the ordinary course of the Debtors' business, the Debtors rely on and engage various goods and service providers (collectively, the "<u>Vendors</u>") that, among other things, provide the Debtors with marketing and advertising services and technology and software services that are necessary for the Wag! Platform's maintenance and upkeep.

88.  As of the Petition Date, the Debtors believe that approximately $2.25 million remains outstanding on account of Trade Claims.  Through the All Trade Motion, the Debtors seek authority to pay $2.25 million in the aggregate on an interim basis, all of which will come due in the interim period, and seek to pay such amounts in the ordinary course of business.

89.  The Debtors believe it is critical that the Debtors' network of Vendors operates on a seamless basis to preserve the value of the Debtors' business and operations.  Without the instant relief, the Debtors' ability to maximize value and drive revenue would be severely undermined and, therefore, the Debtors request approval of such relief because it is in the best interests of the Debtors, their estates, and creditors.  Moreover, the Prepackaged Plan provides for the payment of general unsecured claims in full, so payment of the Trade Vendors will only affect the timing of such payment.

### j.    DIP Motion

90.    To implement the contemplated restructuring and preserve asset value during the pendency of these Chapter 11 Cases, the Debtors require an immediate infusion of new liquidity. Accordingly, the Debtors have negotiated and reached agreement on the terms of debtor-in-possession financing (the "DIP Financing") to be provided by the Prepetition Secured Creditor (in such capacity, the "DIP Lender"), consisting of a super-priority senior secured term loan facility (the "DIP Facility") in an aggregate principal amount up to $6.5 million. The DIP Financing will be secured by a valid, enforceable, fully perfected, and automatic first priority priming lien on all property and assets (or interests therein) of the Debtors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date. Subject to Court approval, $4 million of proceeds from the DIP Financing will be made available to the Debtors on an interim basis.

91.    Additionally, in exchange for the Prepetition Secured Creditor's consent to the Debtors' use of its cash collateral (the "Cash Collateral"), the Debtors propose to provide an adequate protection package to the DIP Lender, consisting of replacement liens that will secure the obligations owing to the DIP Lender to the extent of any diminution in value, superpriority claims, and reporting obligations.

92.    The Debtors believe that the DIP Facility represents the best option available to address their immediate liquidity needs because, in part, it is an essential component of a broader restructuring transaction contemplated by the Prepackaged Plan. Based on my experience and knowledge of the Debtors' current capital structure, as well as the Debtors' operations, and efforts to obtain financing, I do not believe that the Debtors could have obtained financing on more favorable terms from sources other than the DIP Lender, and, similarly, I believe that the Debtors

would be unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

93.     The DIP Facility, together with use of Cash Collateral, will enable the Debtors to operate their business in the ordinary course and seek to obtain confirmation of, and implement, the Prepackaged Plan.  I believe that this will preserve and enhance the value of the Debtors' estates for the benefit of all parties in interest.  I believe implementation of postpetition financing will be viewed favorably by the Debtors' customers and vendors, thereby promoting a successful reorganization.

94.     Without access to the proposed DIP Facility and use of Cash Collateral, I believe that the Debtors will be forced to cease operations and will not be able to consummate the Prepackaged Plan.  In contrast, the value of the Prepetition Secured Creditor's interest in its Prepetition Collateral will be preserved, if not increased, by the DIP Facility and use of Cash Collateral because it ensures the uninterrupted continuation of the Debtors' operations and its continued upkeep of the Prepetition Collateral.

95.     The Debtors, with the assistance of their advisors, including Portage Point, have determined that the DIP Facility will be sufficient to support the Debtors' operations through the pendency of these Chapter 11 Cases and adequate, considering all available assets, to pay administrative expenses due or accruing during the period covered by the Approved Budget.

96.     The Debtors believe that the stay modifications set forth in the motion are ordinary and standard features of postpetition debtor financing facilities and reasonable and fair under the present circumstances.

97.     Absent authority from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably

harmed.  Accordingly, I believe that the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

### k.    Scheduling and Confirmation Motion

98.    Pursuant to the Scheduling and Confirmation Motion, the Debtors seek entry of an order:

(a)    scheduling a combined hearing (the "Combined Hearing") on the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan;

(b)    establishing the deadline to object (the "Objection Deadline") to the adequacy of the information contained in the Disclosure Statement and confirmation of the Prepackaged Plan;

(c)    approving the prepetition solicitation procedures regarding votes to accept the Prepackaged Plan (the "Solicitation Procedures"), including the form of ballot and the form and manner of the notice of the commencement of the Debtors' chapter 11 cases, the Combined Hearing, and the Objection Deadline;

(d)    approving the notice and objection procedures, including the applicable deadline (the "Executory Contract Objection Deadline") for the assumption or rejection of executory contracts and unexpired leases; and

(e)    conditionally (i) suspending the requirement to convene a meeting of creditors under section 341(a) of the Bankruptcy Code, and (ii) excusing the requirement that the Debtors file statements of financial affairs and schedules of assets and liabilities.

99.    Specifically, the Debtors request that the Court schedule certain key dates and deadlines related to the Combined Hearing consistent with the following proposed schedule (the "Proposed Confirmation Schedule"):

| Event | Date/Deadline |
|---|---|
| Voting Record Date | July 20, 2025 |
| Commencement of Solicitation | July 20, 2025 |
| Voting Deadline | July 20, 2025, at 11:59 p.m. (prevailing Eastern Time) |
| Petition Date | July 21, 2025 |
| Combined Hearing Notice, Notices of Non-Voting Status, Member Notice | Within three (3) business days, or as soon as reasonably practicable, after entry of the Proposed Order |

| | |
|---|---|
| Executory Contract Objection Deadline | August 8, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Plan Supplement Filing Deadline | August 15, 2025 at 11:59 p.m. (prevailing Eastern Time) |
| Plan/Disclosure Statement Objection Deadline | August 22, 2025, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Proposed Combined Order | August 27, 2025, at 12:00 p.m. (prevailing Eastern Time), or two (2) business days prior to the Combined Hearing |
| Deadline to File Brief in Support of Confirmation, Including Plan/Disclosure Statement Replies (including, to the extent applicable, replies to any Assumption Objections) | August 27, 2025, at 12:00 p.m. (prevailing Eastern Time), or two (2) business days prior to the Combined Hearing |
| Combined Hearing | August 29, 2025, at a time to be determined, subject to Court availability |

100.    The Debtors also request that, after appropriate notice, the Court enter the Combined Order, approving the adequacy of the Disclosure Statement and confirming the Prepackaged Plan.

101.    Based on my discussions with the Debtors' advisors, I believe that a combined hearing is appropriate in these Chapter 11 Cases because the most sensitive and difficult task required to effectuate a successful reorganization—the negotiation of consensual agreements with critical creditor constituencies—was accomplished before the Petition Date.    Likewise, the Debtors have already completed another significant and complex task required to effectuate a successful reorganization—the negotiation, formulation, and solicitation of a chapter 11 plan of reorganization—and have already accomplished one of the major related objectives, obtaining votes in favor of the Prepackaged Plan from 100% of the Voting Class.    Accordingly, holding a Combined Hearing in these Chapter 11 Cases will promote judicial economy and will allow the Debtors to expeditiously effectuate their consensual restructuring and preserve go-forward value at this critical juncture.

102.     The Proposed Confirmation Schedule will also minimize the adverse effects of the chapter 11 filings upon the Debtors' businesses.  The Debtors operate in a competitive industry, and a prolonged stay in chapter 11 could adversely affect customer and vendor relationships. Conversely, an expedited schedule will maximize benefits to creditors and other stakeholders because it will enable prompt distributions pursuant to the terms of the Prepackaged Plan.  An expeditious restructuring will also minimize the administrative expenses of the Estates.

103.     The Debtors seek to move these Chapter 11 Cases forward as expeditiously as possible.  I believe setting the Combined Hearing no later than approximately August 29, 2025 will maximize the likelihood that the Combined Order will have become final and non-appealable under Bankruptcy Rule 8002 by the time all other conditions to consummation of the Prepackaged Plan are expected to be satisfied, enabling the Debtors to promptly consummate the terms of the Prepackaged Plan, minimize the disruption to the Debtors' business, and avoid the costs and business risks associated with a more protracted chapter 11 process.

104.     The Debtors' significant stakeholder, who voted unanimously to accept the Prepackaged Plan, supports scheduling the Combined Hearing as soon as possible.  While the Debtors do not expect significant objections given the support from the Debtors' key stakeholder for the Prepackaged Plan and the fact that many classes are unimpaired, I believe the proposed period of time within which to object to the Disclosure Statement or Prepackaged Plan will provide parties in interest with ample time to file objections, to the extent they wish to do so.

105.     I believe that the Solicitation Procedures will provide adequate notice of the time for filing and serving objections to, and the date and time of the hearing on, the adequacy of the Disclosure Statement or confirmation of the Prepackaged Plan, and, accordingly, the Debtors are requesting that the Court approve such Solicitation Procedures as adequate.

106.    I believe that the proposed schedule for the Combined Hearing, including the establishment of the Objection Deadline, is in the best interests of all parties in interest in these Chapter 11 Cases.  This schedule is intended to minimize the disruption to the Debtors' businesses and avoid the costs associated with lengthy chapter 11 proceedings.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: July 21, 2025

/s/ *Alec Davidian*
Alec Davidian
Chief Financial Officer
Wag! Group Co., *et al.*

**<u>EXHIBIT 1</u>**

**Organizational Chart**

# Organizational Chart

